IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
June 28, 2006

| | |
|---|---|
| IN RE:<br><br>THEODORE R. ANDRESS, JR.,<br>aka Ted Andress,<br>aka Kite Mechanical Service Inc.,<br>aka Kite Service Company,<br><br>                    Debtor. | Case No. 05-11919-M<br>Chapter 7 |
| CUSTOM HEATING & AIR, INC.,<br>an Oklahoma corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>TED ANDRESS , an individual,<br><br>                    Defendant. | Adv. No. 05-1088-M |

## MEMORANDUM OPINION

This is the story of the sale of a business gone bad. As part of the sale, the seller agreed to work for and not compete with the buyer. The seller failed to live up to this agreement and began to take business from the buyer. Litigation ensued, and the buyer obtained injunctive relief and a significant judgment against the seller. It is the dischargeability of that judgment which is now at issue. The following findings of fact and conclusions of law are made pursuant to Bankruptcy Rule 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b),[1] and its reference to this Court is proper pursuant to 28 U.S.C. § 157(a). Issues of non-dischargeability of debt are core proceedings under the terms of 28 U.S.C. § 157(b)(2)(I). The Court thus has authority to issue its findings of fact, conclusions of law, and judgment.

## Burden of Proof

When dischargeability of a debt is at issue, the creditor must prove the elements of its case by a preponderance of the evidence.[2] Exceptions to discharge are to be narrowly construed in favor of the debtor.[3]

## Findings of Fact

Custom Heating & Air, Inc. ("Custom") is an Oklahoma corporation engaged in the business of providing residential and commercial heating and air conditioning services. Its chief operating officer is Mr. Robert Townsend ("Townsend"). Townsend and his wife own eighty-five per cent of the stock in Custom. Kite Mechanical Service, Inc. ("Kite") was a corporation owned by Mr. Ted Andress ("Andress"), the Debtor and Defendant herein. Kite was also engaged in the heating and air conditioning business and was, in the words of Andress, a "friendly competitor" of Custom. In late 2003, Kite was not profitable, and both Kite and Andress were in significant financial distress. At that time, Andress and Townsend began discussing a potential purchase of Kite by Custom.

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[2] *See Grogan v. Garner*, 498 U.S. 279, 287-288 (1991).

[3] *See Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986), *abrogated on other grounds by Grogan,* 498 U.S. at 279; *see also AT&T v. Herrig (In re Herrig),* 217 B.R. 891 (Bankr. N.D. Okla. 1998).

These discussions culminated in the execution of an Asset Purchase Agreement (the "APA") with an effective date of January 30, 2004.[4]

Under the APA, Custom purchased the following assets of Kite: the business name, the telephone numbers, customer list and records, service files, four motor vehicles, all equipment including office and computer equipment, marketing materials and all remaining parts and inventory of Kite. Under the APA, the purchase price for Kite was $100,000, which the parties allocated as follows:

| | |
|---|---|
| Intangibles: | $55,000.00 |
| Equipment: | $35,000.00 |
| Inventory: | $ 5,000.00 |
| Covenant not to Compete: | $ 5,000.00 |

The covenant not to compete is found in §14 of the APA. Pursuant to this covenant, Andress agreed for a period of three years: (1) not to own more than five per cent of any company engaged in the heating and air conditioning business; (2) not to "induce or attempt to induce any customer or prospective customer of [Custom] to cease doing business in whole or in part with [Custom] or solicit the business of any such customer which competes with any of the products or services offered or sold by [Custom]"; and (3) not to attempt to persuade any of Custom's employees to leave the employ of Custom. Section 15 of the APA provided that "[Andress] shall make good faith effort to refer to [Custom] all of [Andress]'s existing clients, as well as any potential customer that might contact [Andress] in the future."[5] On April 22, 2004, Custom and Andress executed an addendum

---

[4] *Plaintiff's Ex. 1.*

[5] *Plaintiff's Ex. 1, § 15.*

to the APA.[6] This addendum substituted an "insulation blowing hopper" for the computer identified in the original APA.

As part of the APA, Andress and Custom executed an employment agreement (the "Employment Agreement").[7] Under its terms, Andress was to be paid a base salary of $105,000 the first year he worked for Custom and $110,000 in the second year of his employment. Of this base salary, $120,000 was paid immediately and placed into escrow at the request of Andress and/or his counsel[8]. These funds were ultimately used to satisfy tax liabilities owed by Andress. The Employment Agreement contained a covenant not to compete substantially identical to the covenant contained in the APA. On May 7, 2004, the parties executed an addendum to the Employment Agreement that allowed Andress to receive three items of heating equipment in lieu of a paid vacation.[9] These three items of equipment were to be used to complete contracts which Andress had been paid for prior to execution of the APA. The items were to be used by Andress "strictly" for the completion of those jobs, and for no other purpose.

Townsend testified that maintaining Andress in the employ of Custom was a key element in the purchase transaction. According to Townsend, when the key employee of a purchased company continues with Custom, he expects revenues generated as a result of the purchase to be between seventy-five and eighty per cent of the gross revenues earned by the company in the year

---

[6] *See Plaintiff's Ex. 2.*

[7] *See Plaintiffs Ex. 3.*

[8] According to the Employment Agreement, $60,000 was taken from the first year's base salary and placed into escrow, and another $60,000 was taken out of the base salary for the second year. *See Plaintiff's Ex. 3, § 5(A), (B).* In effect, Custom prepaid Andress over 55% of his base salary before he began employment.

[9] *See Plaintiff's Ex. 31.*

prior to acquisition. If continued employment of the key employee (in this case Andress) is not part of the transaction, Townsend's revenue expectation drops to thirty per cent of prior revenues.

Shortly after commencing employment with Custom, Andress began to "moonlight" and solicit business on his own behalf instead of Custom. Andress freely admitted this at trial:

> Q. You intentionally violated the terms of the asset purchase agreement and your employment contract, didn't you?
>
> A. Yes.
>
> Q. You intentionally attempted to take a customer that rightfully belonged to Custom Services and keep her for yourself, didn't you?
>
> A. Yes.
>
> Q. You intentionally took money that should have belonged to Custom Services and you tried to keep it for yourself, didn't you?
>
> A. Yes.
>
> Q. And when I asked you how many times you had done that, that we had not discovered, you asserted your Fifth Amendment right against self-incrimination, right?
>
> A. Based on my counsel's advice, yes, sir.
>
> Q. And now you are asking this Bankruptcy Court to excuse all of your actions, willful, wanton, and otherwise, and grant you a discharge, aren't you?
>
> A. Correct.[10]

In addition to this general admission, evidence was adduced regarding specific examples of misconduct by Andress.

In the fall of 2003, Andress spoke to a Mr. Paul Jackson ("Jackson") about installing a

---

[10] *Transcript of Trial Proceedings Held on April 26, 2006, Docket No. 28*, p. 234, line 22 through p. 235, line 15.

5

heating and air conditioning system in a house which Jackson was constructing. Andress was a family friend of the Jacksons. Prior to execution of the APA and Employment Agreement, Jackson had done business with Andress, and Jackson's father had done business with Kite. Andress advised Jackson he would beat the price of any other contractor. In April or May of 2004, Jackson contacted Andress regarding the installation. Andress came to the construction site and advised Jackson as to his needs. Custom was not discussed. Jackson thought he was dealing with Kite. No written agreement was entered into between the parties; Jackson believed that he and Andress had an oral contract to do the work. Although Andress did provide a crew to install duct work at the residence, no heating and air conditioning equipment was delivered or installed. Jackson made several payments to Andress in May and June of 2004, totaling at least $15,000.00. Jackson inquired of Andress regarding the status of the matter and Andress advised Jackson he would "get the paperwork together" and get back to Jackson. This never occurred.

In June of 2004, Andress asked Jackson to sign a contract for the installation of the equipment. The proposed contract was dated November 21, 2003. Jackson refused to sign the contract. Andress was very anxious to get the contract signed stating that he was trying to get documentation that he entered into this contract prior to the sale of his company. The project was never completed by Andress, nor did Andress ever refund any monies to Jackson.

Mr. Chris Allen ("Allen") had done business with Kite and Andress prior to the execution of the APA, although he had no personal relationship with Andress. In early 2004, Allen determined that his residence needed a new heating and air conditioning system. He called the Kite phone number (which had been assigned to Custom) and received a return call from Andress. Andress came to Allen's residence and informed Allen he would be able to install a heating and air

conditioning system for less money if he did so in the evenings and on weekends. Andress installed a heating and air conditioning system for Allen, but not through Custom.

Concerned about Andress's conduct, Townsend devised a "sting" operation to see if he could catch Andress in the act of stealing business. At some point after Andress went to work for Custom, Ms. Jean Reish ("Reish"), at the request of Townsend, called Custom and asked to speak directly to Andress.[11] Andress returned the call and was advised that Reish wished to have a new heating and air conditioning system installed in her residence. Andress asked Reish how she got his name. Reish told Andress that she heard of Andress through a "friend of a friend." Reish had never met Andress prior to this date or done any business with him or his company. Andress met with Reish at her residence and told her he could save her a significant amount of money if he, and not Custom, provided the system. Reish agreed to this and understood that Andress would do the work himself. Andress provided Reish with a bid to install the system and told Reish to call Andress using his cell phone number, not the Custom or Kite business numbers. Andress next called Reish and told her he could install the system later in the week. The installation was completed; however, near the conclusion of the work, the city inspector arrived at the premises and determined that the installation did not have the proper permits. Upon hearing this, Andress called Reish and instructed her not to inform the city inspectors of his involvement in the transaction.

Townsend believes that Andress performed other work in his own name while in the employ of Custom. This belief was based more on suspicion than fact. Andress refused to disclose any information regarding additional work performed on his own while in the employ of Custom.

---

[11] Reish described herself as having had a "long relationship" with Custom, and stated that she knew Townsend and his wife. *Transcript of Trial Proceedings Held on April 26, 2006, Docket No. 28*, p. 118, lines 19 through 25.

Andress's employment was terminated by Custom on June 24, 2004.

On June 25, 2004, one day after the termination, Custom filed litigation against Andress in the District Court in and for Tulsa County, Oklahoma (the "State Court Litigation"). The State Court Litigation included various and sundry causes of action including breach of the APA, breach of the employment contract, violation of the Oklahoma Trade Secrets Act, interference with business relationships, breach of implied obligation of loyalty, unfair competition, and conversion of assets. On the day the State Court Litigation was filed, Custom also sought a temporary restraining order and temporary injunction against Andress seeking to enjoin Andress from violating the non-compete provisions contained in both the APA and the employment agreement. A temporary restraining order to that effect was entered on June 25, 2004, and a permanent injunction against Andress was entered on July 28, 2004.

Following the entry of these orders, jousting continued between the parties in the state court. Custom sought to hold Andress in contempt for violating the temporary restraining order, which Andress resisted. Moreover, Reish joined in the action seeking injunctive relief against Andress. She was represented by the same counsel that represented Custom.

On February 1, 2005, Custom filed a motion in the State Court Litigation seeking a pre-trial conference. On February 2, 2005, the state court set a pre-trial conference in the state court action on March 4, 2005. There is no proof of service attached to the order for pre-trial conference. Custom admits that it has no such proof of service. Instead, the Court is asked to assume based upon the ordinary business practices of counsel for Custom that a copy of the order for pre-trial conference was sent to counsel for Andress on February 3, 2005.[12] The Court will not make that

---

[12] *See Plaintiff's Ex. 37.*

assumption. Counsel for Andress in the State Court Litigation has testified through an offer of proof that he never received notice of the March 4, 2005, pre-trial conference. The Court finds as a matter of fact that neither Andress or his counsel had notice of the March 4, 2005, pre-trial conference.

As scheduled, the pre-trial conference was held in the State Court Litigation on March 4, 2005. Andress and his counsel failed to appear. As a result of said failure to appear, a judgment (the "Judgment") was entered against Andress.[13] In the Judgment, the state court, "having examined the court files herein, receiving [sic] statements of counsel and after due deliberation thereon," found Andress to be in default. The state court went on to "further find that the allegations contained in Plaintiff's petition are taken as true and correct and that the defendant's actions were wilful and malicious." Judgment was entered against Andress in the principal amount of $185,000.00, plus attorney's fees and costs. The Judgment is now a final order.

To the extent the "Conclusions of Law" contain items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

Custom contends that the amounts owed to it pursuant to the Judgment are not dischargeable under § 523(a)(6) of the Bankruptcy Code. Custom offers three bases for its position. Custom contends that the finding contained in the Judgment that Andress's actions were "willful and malicious" is binding upon this Court under either the *Rooker-Feldman* doctrine or the principle of collateral estoppel. Failing either of those theories, Custom contends that the evidence presented to this Court mandates the conclusion that the Judgment is non-dischargeable.

*The Rooker-Feldman Doctrine*

---

[13] *Plaintiff's Ex. 23.*

The *Rooker-Feldman* doctrine prevents this Court from reviewing claims that were actually decided by the state court, or claims that are "inextricably intertwined" with the judgment of the state court. The doctrine has been summarized by the United States Court of Appeals for the Tenth Circuit as follows:

> Under 28 U.S.C. § 1257, "federal review of state court judgments can be obtained only in the United States Supreme Court." *Kiowa Indian Tribe of Okla. v. Hoover*, 150 F.3d 1163, 1169 (10th Cir.1998) (citing *Dist. of Columbia Ct. of App. v. Feldman*, 460 U.S. 462, 476, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). As a result, the *Rooker-Feldman* doctrine prohibits a lower federal court from considering claims actually decided by a state court, *Rooker v. Fid. Trust Co.*, 263 U.S. 413, 415-16, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and claims "inextricably intertwined" with a prior state-court judgment. *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303. In other words, *Rooker-Feldman* precludes "a party losing in state court ... from seeking what in substance would be appellate review of [a] state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." *Johnson v. De Grandy*, 512 U.S. 997, 1005-06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994).[14]

Under the *Rooker-Feldman* doctrine, "'lower federal courts possess no power whatever to sit in direct review of state court decisions.'"[15] The doctrine "applies to all state-court judgments, including those of intermediate state courts,"[16] but "applies only to suits filed after state proceedings are final."[17]

The *Rooker-Feldman* doctrine is not without its limits. The United States Supreme Court has held that the doctrine

> is confined to cases of the kind from which the doctrine acquired its name: cases

---

[14] *Kenmen Eng'g v. City of Union*, 314 F.3d 468, 473 (10th Cir. 2002), *abrogated on other grounds by Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).

[15] *Id.* at 474–75.

[16] *Id.* at 473.

[17] *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006).

> brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings and inviting district court review and rejection of those judgments. *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.[18]

The United States Court of Appeals for the Seventh Circuit put it another way:

> The Rooker-Feldman doctrine asks: is the federal plaintiff seeking to set aside a state judgment, or does he present some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party? If the former, then the district court lacks jurisdiction; if the latter, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.[19]

The Bankruptcy Appellate Panel of the Eighth Circuit recently dealt with a case involving the applicability of the *Rooker-Feldman* doctrine to a default judgment.[20] In that case, the creditor had obtained a default judgment against the defendant for fraud. When the defendant sought protection under Chapter 7 of the Bankruptcy Code, the plaintiff/creditor filed a dischargeability complaint under § 523(a)(2), and argued that the state court judgment was binding upon the issue of fraud, citing *Rooker-Feldman*. At trial, the bankruptcy court agreed, and found the debt non-dischargeable. On appeal, the bankruptcy appellate panel reversed, citing the *Exxon* decision and noting that

> Thus, this case simply does not present a situation covered by the *Rooker-Feldman* doctrine – the state court losers (the Debtors) are not trying to obtain a review and rejection of the Default Judgment; to the contrary, the state court winner (the Plaintiff) is trying to offensively use the Default Judgment to establish the basis for a derivative claim; *i.e.*, a determination of nondischargeability. And that use of a state court judgment falls clearly within the ambit of the collateral estoppel

---

[18] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

[19] *GASH Assoc. v. Vill. of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993); *see also Smith v. Cowden (In re Cowden)*, 337 B.R. 512, 540 (Bankr. W.D. Pa. 2006) (citing *GASH*).

[20] *Jacobus v. Binns (In re Binns)*, 328 B.R. 126 (8th Cir. BAP 2005).

doctrine.[21]

The matter was remanded to the bankruptcy court for a determination of whether collateral estoppel applied to the state court judgment or whether the matter should be tried in its entirety.

Andress is not the plaintiff in this adversary proceeding. He is not seeking to set aside the Judgment. Instead, Custom argues that the Judgment effectively precludes this Court from independently considering the question of dischargeability. Custom is attempting to use the Judgment as an offensive weapon to prevent this Court from determining whether a debt may be discharged in bankruptcy. The argument runs contrary to the ruling of the United States Supreme Court in *Exxon Mobil*. At issue here is not the validity of the Judgment, but whether the Judgment may be discharged by Andress in his bankruptcy case. Nothing in the *Rooker-Feldman* doctrine prevents this Court from making such a determination; indeed, such a determination falls squarely within the core jurisdiction of the bankruptcy court.[22]

*Collateral Estoppel/Issue Preclusion*

The next question is whether, under the doctrine of collateral estoppel, the finding in the Judgment that Andress acted "willfully and maliciously" precludes this Court from further consideration of the issue. The application of the doctrine of collateral estoppel, or issue preclusion, to dischargeability proceedings is well established.[23] The Bankruptcy Appellate Panel of the Tenth Circuit has rendered an excellent analysis of the application of the doctrine of collateral estoppel to issues of dischargeability:

---

[21] *Id.* at 131–32.

[22] *See* 28 U.S.C. § 157(b)(2)(I).

[23] *Grogan*, 498 U.S. at 284 n.11.

> While a bankruptcy court ultimately determines whether a debt is non-dischargeable under § 523, a state court judgment may preclude the relitigation of settled facts under the collateral estoppel doctrine. *See In re Wallace*, 840 F.2d 762, 765 (10th Cir.1988). When a federal court reviews the preclusive effect of a state court judgment, the full faith and credit statute directs a federal court to look to the preclusion law of the state in which the judgment was rendered. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Under Oklahoma law, collateral estoppel is a doctrine that prevents the relitigation of an issue of ultimate fact that has already been determined by a valid judgment in previous litigation between the same parties. *Fent v. Oklahoma Natural Gas Co.*, 898 P.2d 126, 133 (Okla.1994) (stating "once a court had decided an issue of fact or law necessary to its judgment, the same parties or their privies may not relitigate the issue in a suit brought upon a different claim."). However, preclusion will only bar relitigation of a factual issue if the party was afforded a "full and fair opportunity" to litigate the critical issue in the prior action. *Fent*, 898 P.2d at 133.[24]

Unless all factors are present, the doctrine of collateral estoppel does not apply. These standards have been applied by this Court on at least three occasions.[25] As noted in a recent decision of the Bankruptcy Appellate Panel of the Tenth Circuit, "[w]hether a party had a full and fair opportunity to litigate may be examined by questioning 'whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to fully litigate the issue, or whether effective litigation was limited by the nature or relationship of the parties.'"[26]

---

[24] *Merrill v. Merrill (In re Merrill)*, 252 B.R. 497, 504–05 (10th Cir. BAP 2000), *aff'd*, 15 Fed. Appx. 766 (10th Cir. 2001) (footnote omitted).

[25] *See Merrill v. Merrill (In re Merrill)*, 246 B.R. 906 (Bankr. N.D. Okla. 2000), *aff'd*, 252 B.R. 497 (10th Cir. BAP 2000), *aff'd*, 15 Fed. Appx. 766 (10th Cir. 2001); *Filbeck v. Clegg (In re Clegg)*, 189 B.R. 818 (Bankr. N.D. Okla. 1995); *Grimshaw v. Grimshaw (In re Grimshaw)*, 57 B.R. 181 (Bankr. N.D. Okla. 1986).

[26] *Hill v. Putvin (In re Putvin)*, 332 B.R. 619, 626 (10th Cir. BAP 2005) (citing *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1521 (10th Cir. 1990)). *See also United States v. Botefuhr*, 309 F.3d 1263, 1282 (10th Cir. 2002); *Salazar v. City of Okla. City*, 976 P.2d 1056, 1060–61 (Okla. 1999) ("The party relying on the defense of issue preclusion bears the burden of establishing that the issue to be precluded was actually litigated and determined in the prior action between the parties or their privies, and that its resolution was essential to a decision in that action.").

When the state court entered the Judgment, it apparently took no evidence.[27] The Judgment appears to have been entered as a sanction for Andress's (and/or his counsel's) failure to appear at a pre-trial conference. The record does not establish that Andress had notice of the pre-trial conference. Counsel for Andress has testified (through an uncontested offer of proof) that he had no such notice. In response, counsel for Custom has made an offer of proof that it sent <u>something</u> to Andress's counsel on or about the time that the pre-trial conference was set, and asks the Court to presume that this mailing was a notice of the scheduled pre-trial conference. The Court will not make such a presumption. Custom has the burden of proof in this matter to show by a preponderance of the evidence that Andress had notice of the pre-trial conference and thus had a "full and fair opportunity" to litigate the issues raised at the conference. Custom has failed to meet this burden; accordingly, the Court will not apply the doctrine of collateral estoppel in this case.

There is also nothing in the record to indicate that the issue of whether Andress acted with "willful and malicious" intent was actually litigated by the state court. The complaint filed in the State Court Litigation contains seven causes of action. In three of those causes, Custom alleges in conclusory fashion that Andress acted "willfully and maliciously" without pleading specific facts in support of the allegations.[28] The Judgment is generic in nature. This Court cannot determine which of the seven causes of action the state court relied upon in entering the Judgment. As noted above, the Judgment was entered as a sanction, not on the basis of substantive evidence. On the record before it, the Court cannot conclude that the issue of whether Andress acted "wilfully and

---

[27] *See Plaintiff's Ex. 23* ("Whereupon, <u>the Court having examined the Court files herein [and] receiving statements of counsel</u> . . . ") (emphasis added).

[28] *See Plaintiff's Ex. 6*, ¶¶ 21, 24 and 27.

maliciously" was actually litigated by the state court.[29]  This conclusion also precludes application of the doctrine of collateral estoppel to the Judgment.

*The Merits of the § 523(a)(6) Claim*

Custom has based its claim of non-dischargeability on § 523(a)(6) of the Bankruptcy Code, which provides that

> (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt —
>
>> (6) for willful and malicious injury by the debtor to another entity or the property of another entity.[30]

"Nondischargeability under 523(a)(6) requires proof of two elements–that the injury is both willful and malicious."[31]  In the Tenth Circuit, in order for conduct to be willful under § 523(a)(6), "the debtor must desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it."[32]  With respect to the element of malice,

> Under § 523(a)(6), the debtor's malicious intent can be shown in two ways. In the rare instances in which there is direct evidence that the debtor's conduct was taken with the specific intent to harm the creditor, the malice requirement is easily established.  More commonly, however, malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that

---

[29] At least one court has held that, where it is argued that a judgment by default has preclusive effect, such preclusive effect should be limited to cases where the court actually heard evidence in support of the judgment. *See Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 387 (Bankr. N.D. Ohio 1999) ("[T]he plaintiff must actually submit to the state court admissible evidence apart from his pleadings.  In other words, a plaintiff's complaint, standing alone, can never provide a sufficient basis for the application of the collateral estoppel doctrine.").

[30] § 523(a)(6).

[31] *In re Shore*, 317 B.R. 536, 542 (10th Cir. BAP 2004) (citing *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004)).

[32] *In re Moore*, 357 F.3d at 1129 (quoting *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999)).

15

knowledge, proceeded to take action in violation of those rights.[33]

Put another way, one must prove "that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury."[34] A determination as to whether a debtor acted with malice is by its nature a subjective test: "the court must determine what the debtor knew or intended with respect to the consequences of his actions."[35]

In this case, when it comes to the intentions of Andress, the Court has been given a road map. Andress has admitted that he violated the covenant not to compete and diverted potential customers of Custom for his own personal benefit. He did so with knowledge of his contractual obligations to Custom, and he fully intended the consequences of his actions. The Court has no difficulty finding that Andress acted willfully and with malice in this regard. The Court concludes that Andress violated his covenant not to compete, and that such a violation qualifies as "willful and malicious" conduct under § 523(a)(6).[36]

However, willful and malicious conduct, without more, does not give rise to a finding of non-dischargeability under § 523(a)(6). There must also be an "injury" to the creditor/plaintiff. The

---

[33]*C.I.T. Fin. Servs., Inc. v. Posta (In re Posta)*, 866 F.2d 364 (10th Cir. 1989), *overruled on other grounds by Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[34] *In re Moore*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).

[35] *In re Shore*, 317 B.R. at 542.

[36] It is important to note that violation of the covenant not to compete is the only basis for a § 523(a)(6) claim which Custom has established. Notwithstanding the various and sundry allegations made by Custom in the State Court Litigation, there is no evidence that Andress stole customer lists and/or used such lists for his own benefit, exploited trade secrets, made deliberate attempts to destroy good will between Custom and its customers, or converted property of Custom for his own benefit. The evidence is that Andress installed as many as three heating and air conditioning systems on his own behalf in violation of his covenant not to compete.

difficulty in this case emerges when one attempts to quantify the "injury" element of § 523(a)(6). Although the Court was unable to find (and the parties failed to cite) any Oklahoma case law upon the issue, many courts have held that the proper measure of damages for breach of a covenant not to compete "is the net profit of which plaintiff was deprived by reason of defendant's improper competition with plaintiff."[37] Moreover, "Plaintiff must not only show in such a case his right of recovery, but the elements and facts which compose the measure of his recovery, and not leave the jury [or the Court] to rove without guide or compass through the limitless fields of conjecture and speculation."[38] Bankruptcy courts have not hesitated to find a debt dischargeable where, even though willful and malicious conduct is present, a creditor has failed to establish damages with some degree of certainty.[39]

There are four potential sources of evidence which the Court can consider in determining the amount of Custom's damages. The first (and the one upon which Custom seems to rely most heavily) is the Judgment. Custom seems to take the position that the existence of the Judgment establishes the amount of its non-dischargeable claim. Next, there is the testimony regarding the

---

[37] *See, e.g., Earth Alterations, LLC, v. Farrell*, 800 N.Y.S. 2d 744, 745 (N.Y. App. Div. 2005) (citations omitted); *see also D.W. Trowbridge Ford, Inc. V. Galyen*, 262 N.W.2d 442, 446 (Neb. 1978) (measure of damages for breach of non-compete agreement is lost profits); *Ibarra v. Mo. Poster & Sign Co.*, 838 S.W.2d 35, 39 (Mo. Ct. App. 1992) (awarding lost profit damages for breach of non-compete agreement); *Gen. Auto Parts Co., Inc. v. GPC*, 979 P.2d 1207, 1213 (Idaho 1999) ("In the covenant not to compete cases, the proper measure of damages is the impairment of good will and the plaintiff's lost profits.") (citations omitted).

[38] *Midlands Transp. Co. v. Apple Lines, Inc.*, 197 N.W.2d 646, 648 (Neb. 1972) (quoting *McGinnis v. Hardgrove*, 145 S.W. 512 (Mo. Ct. App. 1912)).

[39] *See, e.g., Hi-Qual Roofing & Siding Materials, Inc., v. Ridsdale (In re Ridsdale)*, 286 B.R. 225, 237 (Bankr. W.D.N.Y. 2002) (refusing to award lost revenues as an element of a § 523(a)(6) claim because such damages, on the basis of evidence adduced at trial, were "too speculative").

various jobs performed by Andress in violation of his covenant not to compete. The Court could also look to the testimony of Townsend wherein he stated his belief that Andress's conduct cost Custom hundreds of thousands of dollars. Finally, there is the APA itself, in which the parties ascribed a value of $5,000 to the covenant not to compete.

To the extent that Custom argues that the Judgment in and of itself establishes the existence and amount of <u>non-dischargeable</u> debt, the Court rejects that notion. "Where a debtor is found liable for conversion under 11 U.S.C. § 523(a)(6), the appropriate measure of damages is an amount equal to injury caused by the Debtor, rather than any other sum owed by the debtor."[40] In this case, the Judgment contains no detail regarding the award of damages. This Court cannot determine what portion (if any) of the $185,000 awarded by the state court is compensation for violation of the covenant not to compete, what portion relates to other causes of action contained in the complaint, and/or what portion is a sanction for Andress's failure to appear at the pre-trial conference. The Court will not speculate in this regard. Moreover, the Court has ruled that the Judgment is not entitled to any preclusive effect in this adversary proceeding. Accordingly, the Judgment is of no help whatsoever in determining what amount, if any, of the debt owed by Andress to Custom should not be discharged in this case.[41]

The evidence regarding Andress's diversion of prospective customers of Custom for his own

---

[40] *Bonfiglio v. Harkema Assoc., Inc. (In re Bonfiglio)*, 171 B.R. 245, 251 (Bankr. E.D. Mich. 1994) (citing *In re Modicue*, 926 F.2d 452, 453 (5th Cir. 1991)).

[41] This decision should not be construed as a review or reconsideration of the validity of the Judgment by this Court. Such a decision would violate the *Rooker-Feldman* doctrine. The Court is not saying that the Judgment does not create a valid claim against Andress; the Court only states that the existence of the Judgment does not assist the Court in the determination of dischargeability.

personal gain is equally unhelpful. When it comes to the installation of the heating and air conditioning system for Reish, Andress's conduct cannot be said to have injured Custom. Not only did Custom consent to the services which Andress performed for Reish, Andress's conduct was the direct result of Custom using Reish as the "bait" in a "sting" operation. With respect to the balance of business that Andress allegedly diverted from Custom, the evidence adduced at trial consisted of two other customers (Jackson and Allen) who had Andress perform services for them. There is no evidence as to the amount of profit Custom could have expected to receive if the work performed by Andress had been performed by Custom. Although Townsend testified to his belief that other business that rightfully belonged to Custom had been diverted by Andress, there is nothing in that testimony from which the Court could calculate the amount of profit lost by Custom.

The Court also has Townsend's allegation that Andress's conduct cost Custom hundreds of thousands of dollars. At best, Townsend's testimony was general in nature, and went to the entire failure of the Kite purchase, not just to damages caused by Andress's breach of the covenant not to compete.[42] This testimony contains no detail as to what Townsend believes his actual damages to

---

[42] The bulk of Townsend's testimony on this issue went to his belief that the amount of the Judgment ($185,000) did not reflect the actual damages which Custom had suffered:

> Q. And if I could direct your attention to the second page, I will ask you the amount of the judgment that the court entered?
>
> A. It was $185,000 together with reasonable attorney fees of $19,929, and the cost of this action in the sum of $1,406.06.
>
> Q. Does the judgment contain any punitive damages?
>
> A. I don't know the answer to that.
>
> Q. Do you believe that this journal entry of judgment accurately reflects the amount of damages you sustained as a result of the debtor's actions?

be or why the Judgment is not sufficient. The best source of information about what customers had been from diverted from Custom to Andress, Andress himself, was not talking, having invoked his Fifth Amendment rights when questioned on the issue.

The only specific number in the record regarding the value of the covenant not to compete is found in the APA. Custom was willing to pay the rather modest sum of $5,000 to Andress in exchange for his commitment not to compete with Custom. Custom did not get what it paid for; Andress violated the covenant. The Court finds that Custom is entitled to recover the funds paid for the covenant not to compete, and nothing more.

## Conclusion

Of the obligations owed by Andress to Custom, Custom is entitled to a judgment stating that $5,000 of those obligations are not discharged in this bankruptcy case. The balance of the obligations are discharged. A separate judgment consistent with this memorandum opinion shall be entered concurrently herewith.

Dated this 28th day of June, 2006.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

4605.6

---

A. Absolutely. I think it's conservative.

Q. Why do you think it's conservative?

A. Well, because of the amount of business. If you go back and take a look at what the actual business generated versus what was there before, and that business is lost over a four- or five-, six-year period, I think that's a conservative number.

*Transcript of Trial Proceedings Held on April 26, 2006, Docket No. 28*, page 114, lines 7 through 21.